IN THE

# United States Court of Appeals

FOR THE

# Ninth Circuit

———————

ABDIRAHMAN ADEN KARIYE, MOHAMED MOUSLLI, AND HAMEEM SHAH

*Plaintiffs-Appellants,*

*v.*

ALEJANDRO MAYORKAS, IN HIS OFFICIAL CAPACITY AS SECRETARY OF THE U.S. DEPARTMENT OF HOMELAND SECURITY, *ET AL.*,

*Defendants-Appellees.*

———————

On Appeal from the United States District Court for the Central District of California
Civil Action No. 2:22-cv-01916
The Honorable Fred W. Slaughter

———————

## *AMICI CURIAE* BRIEF OF TWELVE CIVIL RIGHTS AND GRASSROOTS ORGANIZATIONS IN SUPPORT OF PLAINTIFFS-APPELLANTS

———————

| | |
|---|---|
| Golnaz Fakhimi<br>Reem Subei<br>MUSLIM ADVOCATES<br>1032 15th Street N.W. #362<br>Washington, D.C. 20005<br>(202) 655-2969 | Laura Lin<br>SIMPSON THACHER & BARTLETT LLP<br>2475 Hanover Street<br>Palo Alto, California 94304<br>(650) 251-5160<br><br>*Counsel for Amici Curiae* |

# CORPORATE DISCLOSURE STATEMENT

I, Golnaz Fakhimi, attorney for *amici curiae*, certify that *amici* are not-for-profit organizations.  No *amicus* has a parent corporation.  No *amicus* issues stock, nor does there exist a publicly held corporation that owns 10% or more of the stock of any *amicus*.

/s/ Golnaz Fakhimi
Golnaz Fakhimi
MUSLIM ADVOCATES
1032 15th Street N.W. #362
Washington, D.C. 20005
(202) 655-2969

*Counsel for Amici Curiae*

# TABLE OF CONTENTS

SUMMARY OF ARGUMENT ..................................................................................2

ARGUMENT .......................................................................................................5

    I.    False and Harmful Anti-Muslim Stereotypes Are Entrenched in
    Defendants' Practices. ..........................................................................5

        A.    Bias and animus against Muslims and people perceived to
        be Muslim lie at the heart of this case. .......................................5

        B.    Bias and animus against people who are Muslim and
        perceived to be Muslim are evident in this case. ......................11

        C.    The allegations in this case tie to a broader pattern of
        conduct by CBP and DHS reflecting bias and animus
        against Muslims and people perceived to be Muslim. ..............13

    II.    The Resolution of This Case May Have Far-Reaching Impacts
    on the Lived Experiences of Muslim Americans and People
    Perceived to Be Muslim. ....................................................................21

        A.    Practicing Muslims face significant discrimination due to
        their faith, leading to emotional, mental, and social
        challenges. .................................................................................22

        B.    Individuals perceived to be Muslim also face
        discrimination and its associated harms. ..................................25

CONCLUSION .................................................................................................29

# TABLE OF AUTHORITIES

**Cases**

*Ariz. Students' Ass'n v. Ariz. Bd. of Regents*,
  824 F.3d 858 (9th Cir. 2016) ...................................................................4

*Hunley v. Instagram, LLC*,
  73 F.4th 1060 (9th Cir. 2023) ...................................................................4

*Starr v. Baca*,
  652 F.3d 1202 (9th Cir. 2011) ..................................................................4

**Legislative Materials**

*House Intelligence Committee Hearing on FBI Counterterrorism and Intelligence Operations*, 112th Cong. (2011) (statement of Rep. Jan Schakowsky).........................................................................................9

*The End Racial Profiling Act of 2001: Hearing Before the Subcomm. on the Constitution, Federalism, and Property Rights,* 107th Cong. 59 (2000) ...............8

**Other Materials**

Ackerman, Spencer, *FBI Teaches Agents: 'Mainstream' Muslims Are 'Violent, Radical'*, WIRED (Sept. 14, 2011),
  https://www.wired.com/2011/09/fbi-muslims-radical/ .......................................10

Akbar, Amna, *Policing "Radicalization"*, 3 U.C. IRVINE L. REV. 809 (2013).........9

Awan, Imran & Irene Zempi, *Non-Muslim men who suffer Islamophobia: A Briefing Paper* (Preparation for the report to the 46th Session of Human Rights Council, 2020), at 9• 10,
  https://www.ohchr.org/sites/default/files/Documents/Issues/Religion/Islam ophobia-AntiMuslim/Civil%20Society%20or%20Individuals/ProfAwan-4.pdf .....................................................................................................27

Bailey, Ronald, *Do Muslims Commit Most U.S. Terrorist Attacks? Nope. Not even close.*, REASON (Mar. 24, 2017),
  https://reason.com/2017/03/24/do-muslims-commit-most-us-terrorist-atta/ .......10

Beydoun, Khaled A., *Islamophobia: Towards a Legal Framework*, 116 COLUMBIA L. REV. ONLINE 108 (2016) ..........................................................5, 6

Border Questioning – Produced Documents, ACLU (Mar. 12, 2012), https://www.aclu.org/documents/border-questioning-produced-documents .......16

Cauchi, E.D. & Imtiaz Tyab, *U.S. terrorist watchlist grows to 2 million people — nearly doubling in 6 years*, CBS NEWS (Dec. 14, 2023), https://www.cbsnews.com/news/us-terrorist-watchlist-grows/ ...........................19

Considine, Craig, *The Racialization of Islam in the United States: Islamophobia, Hate Crimes, and "Flying while Brown"*, 8 RELIGIONS 9, no. 165, 2017, https://www.mdpi.com/2077-1444/8/9/165 .............................6, 11

*CRCL Compliance Branch FY2020, Q1 and Q2*, DEP'T OF HOMELAND SEC., https://www.dhs.gov/sites/default/files/publications/compliance-one-pager-2020.pdf .......................................................................................................15

*Demographic Information*, SOUTH ASIAN AMERICANS LEADING TOGETHER, https://saalt.org/south-asians-in-the-us/demographic-information/ .....................26

Elsheikh, Elsadig, Basima Sisemore, & Natalia Ramirez Lee, *Legalizing Othering: The United States of Islamophobia*, HAAS INSTITUTE FOR A FAIR AND INCLUSIVE SOCIETY AT U.C. BERKELEY (Sept. 2017), https://belonging.berkeley.edu/sites/default/files/haas_institute_legalizing_othering_the_united_states_of_islamophobia.pdf .................................................7

Fisher, Linda E., *Guilt by Expressive Association: Political Profiling, Surveillance and the Privacy of Groups*, 46 ARIZ. L. REV. 621 (2004) .................7

*#FlyingWhileMuslim: Stories from our Community*, MPOWER CHANGE, https://www.mpowerchange.org/flyingwhilemuslimstories (last visited Feb. 2, 2024) .....................................................................................................18

Forrester, Andrew C., *Middle Eastern or North African in U.S. Government Surveys: A Preview of MENA Demographics*, CATO INSTITUTE (Sept. 27, 2023), https://www.cato.org/briefing-paper/middle-eastern-or-north-african-us-government-surveys-preview-mena-demographics ...........................26

Goldman, Adam, and Matt Apuzzo, *NYPD: Muslim Spying Led to No Leads, Terror Cases*, ASSOC. PRESS (Aug. 21, 2012), https://www.ap.org/ap-in-the-news/2012/nypd-muslim-spying-led-to-no-leads-terror-cases .......................7

Grubb, Patrick, *Source provides directive telling CBP officers to detain Iranian-born travelers*, THE NORTHERN LIGHT (Jan. 29, 2020),

https://www.thenorthernlight.com/stories/source-provides-directive-telling-cbp-officers-to-detain-iranian-born-travelers,9315 ...........................16–17

Hajj Information Sheet, ISLAMIC NETWORKS GROUP, https://ing.org/resources/for-all-groups/calendar-of-important-islamic-dates/hajj-information-sheet/ (last visited Feb. 2, 2024) ....................................11

*Hundreds of Legal Community Members Demand Action To Stop Racist Targeting of Palestine Advocates and Safeguard Fundamental Rights*, PALESTINE LEGAL (Oct. 19, 2023), https://palestinelegal.org/legal-community-letter....................................................................................................28

Hussain, Murtaza, *Complaints Describe Border Agents Interrogating Muslim Americans, Asking For Social Media Accounts*, THE INTERCEPT (Jan. 14, 2017), https://theintercept.com/2017/01/14/complaints-describes-border-agents-interrogating-muslim-americans-asking-for-social-media-accounts/ ........................................................................................15–16

Jacobs, Harrison, *American Muslim Reporter Describes 'Dehumanizing' Treatment At US Border*, BUSINESS INSIDER (Sept. 24, 2013), https://www.businessinsider.com/sarah-aburrahman-detained-at-us-border-2013-9?r=US&IR=T ............................................................................16

Kidd, Thomas S., *"Is It Worse to Follow Mahomet than the Devil?" Early American Uses of Islam*, 72 CHURCH HISTORY 766 (2003) ..................................6

KIDD, THOMAS S., AMERICAN CHRISTIANS AND ISLAM: EVANGELICAL CULTURE AND MUSLIMS FROM THE COLONIAL PERIOD TO THE AGE OF TERRORISM (2009) ............................................................................5–6

Letter from Hugh Handeyside, American Civil Liberties Union Foundation, on behalf of Zainab Merchant, to John V. Kelly, U.S. Dep't of Homeland Sec., et al. re: Repeated Detention, Search, and Intrusive Questioning of U.S. Citizen at Multiple U.S. Airports and Ports of Entry (Aug. 14, 2018) https://www.aclu.org/cases/zainab-m?document=zainab-merchant-administrative-complaint-department-homeland-security#legal-documents.......15

Letter from Sen. Elizabeth Warren, et al. to Hon. Merrick Garland, et al., at 9 (Dec. 20, 2023), https://www.warren.senate.gov/imo/media/doc/2023.12.20%20Terrorism%20Watchlist%20Letter.pdf ........................................................20, 21

Letter from The Sikh Coalition, et al. to Sec. Alejandro Mayorkas, Department of Homeland Security, re: Ending border officials' religious-freedom violations and their practice of trashing migrants' personal belongings (Aug. 22, 2022), https://www.aclu.org/documents/letter-dhs-secretary-mayorkas-ending-border-officials-religious-freedom-violations .........17

Letter of Complaint (ACLU_BQ_000040), Office for Civil Rights and Civil Liberties, U.S. Department of Homeland Security (Mar. 23, 2011), https://www.aclu.org/files/borderquestioning/ACLU_BQ_000040.pdf ..............25

Letter of Complaint (ACLU_BQ_000048), Office for Civil Rights and Civil Liberties, U.S. Department of Homeland Security (Mar. 23, 2011), https://www.aclu.org/files/borderquestioning/ACLU_BQ_000048.pdf ........24–25

Levinson-Waldman, Rachel, Harsha Panduranga, and Faiza Patel, *Social Media Surveillance by the U.S. Government*, BRENNAN CENTER FOR JUSTICE (Jan. 7, 2022), https://www.brennancenter.org/our-work/research-reports/social-media-surveillance-us-government .........................................27, 28

Marks, Rachel, Paul Jacobs & Alli Coritz, *Lebanese, Iranian and Egyptian Populations Represented Nearly Half of the MENA Population in 2020 Census*, UNITED STATES CENSUS BUREAU (Sept. 21, 2023), https://www.census.gov/library/stories/2023/09/2020-census-dhc-a-mena-population.html ....................................................................................................26

Masci, David, *Many Americans see religious discrimination in U.S. – especially against Muslims*, PEW RESEARCH CENTER (May 17, 2019), https://www.pewresearch.org/short-reads/2019/05/17/many-americans-see-religious-discrimination-in-u-s-especially-against-muslims/ ......................23

Memorandum from Cameron P. Quinn, Office for Civil Rights and Civil Liberties, to Mark A. Morgan and Scott K. Falk, U.S. Customs and Border Protection, re: Invalidating F1 Visas of Iranian Nationals (June 15, 2020), https://www.dhs.gov/sites/default/files/publications/retention-memo-cbp-invalidating-f1-visas-iranian-nationals-06-15-20.pdf .........................................17

Memorandum from Dana Salvano-Dunn, Office for Civil Rights and Civil Liberties, to Chris Magnus & Scott K. Falk, U.S. Customs and Border Protection, re: Allegations Relating to Treatment of Religious Items During CBP Processing and Access to Religious Meals (Nov. 10, 2022), https://www.dhs.gov/sites/default/files/2023-05/retention-memo-cbp-religious-items-meals-11-10-22.pdf ....................................................................17

Memorandum from Dana Salvano-Dunn, Office for Civil Rights and Civil Liberties, to Chris Magnus & Scott K. Falk, U.S. Customs and Border Protection, re: Tactical Terrorist Response Team (Apr. 5, 2022), https://www.dhs.gov/sites/default/files/2022-07/2022.04.05%20CRCL%20Retention%20Memo%20to%20CBP%20-%20Tactical%20Terrorist%20Response%20Team%20-%20Redacted_508.pdf ......................................................................................15

Memorandum from Margo Schlanger, Office for Civil Rights and Civil Liberties, and Audrey J. Anderson, Office of the General Counsel, to Alan Bersin and Alfonso Robles, U.S. Customs and Border Protection, re: Complaint No. 10-10-CBP-0137 (*inter alia*) (May 3, 2011), https://www.aclu.org/files/borderquestioning/ACLU_BQ_000016.pdf ..............16

Miller, Todd, *Citizens in Name Only: Muslim-Americans on the U.S.-Canada Border*, NORTH AMERICAN CONGRESS ON LATIN AMERICA (Sept. 12, 2012), https://nacla.org/blog/2012/9/12/citizens-name-only-muslim-americans-us-canada-border ................................................................16

Mogahed, Dalia & Youssef Chouhoud, *American Muslim Poll 2017: Muslims at the Crossroads*, INSTITUTE FOR SOCIAL POLICY AND UNDERSTANDING, at 13• 14 (2017), https://www.ispu.org/wp-content/uploads/2017/03/American-Muslim-Poll-2017-Report.pdf ...................16

Mohamed, Besheer & Jeff Diamant, *Black Muslims Account for a Fifth of All U.S. Muslims and About Half Are Converts to Islam*, PEW RESEARCH CENTER (Jan. 17, 2019), https://www.pewresearch.org/short-reads/2019/01/17/black-muslims-account-for-a-fifth-of-all-u-s-muslims-and-about-half-are-converts-to-islam/ .................................................................26

Mohamed, Besheer, *New estimates show U.S. Muslim population continues to grow.* PEW RESEARCH CENTER (Jan. 3, 2018), https://www.pewresearch.org/short-reads/2018/01/03/new-estimates-show-u-s-muslim-population-continues-to-grow/ ................................................21

Moslimani, Mohamed, et al., *Facts About the U.S. Black Population*. PEW RESEARCH CENTER (Jan. 18, 2024), https://www.pewresearch.org/social-trends/fact-sheet/facts-about-the-us-black-population/ ........................................25

*National Arab American Demographics*, ARAB AMERICAN INSTITUTE, https://www.aaiusa.org/demographics (last visited Feb. 2, 2024) ......................26

Neiwert, David, et al., *Homegrown Terror*, REVEAL (June 22, 2017), https://apps.revealnews.org/homegrown-terror/ ...................................................10

Panduranga, Harsha & Faiza Patel, *Stronger Rules Against Bias: A Proposal for a New DHS Nondiscrimination Policy*, BRENNAN CENTER FOR JUSTICE (Sept. 15, 2022), https://www.brennancenter.org/our-work/policy-solutions/stronger-rules-against-bias .......................................................18, 19, 20

*Racial Profiling: Definition*, ACLU (Nov. 23, 2005), https://www.aclu.org/documents/racial-profiling-definition ................................8

Ramirez, Deborah A., et al., *Defining Racial Profiling in a Post-September 11 World*, 40 AM. CRIM. L. REV. 1195 (2003) ............................................7, 8

Representative Katie Porter, Letter to the President of the United States (June 27, 2023), https://www.cair.com/wp-content/uploads/2023/06/RepPorterLetter.pdf ....................................................19

Rose, Joel, *CBP Chief Admits Officers 'Overzealous'; Critics Say Iranians And Others Targeted*, NPR (Feb. 13, 2020), https://www.npr.org/2020/02/13/805409436/cbp-chief-admits-officers-overzealous-critics-say-iranians-and-others-targeted...........................................17

Ruiz-Grossman, Sarah, *Most of America's Terrorists Are White, and Not Muslim*, HUFFINGTON POST (Aug. 23, 2017), http://www.huffingtonpost.com/entry/domestic-terrorism-white-supremacists-islamistextremists_us_594c46e4e4b0da2c731a84df......................10

Samari, Goleen, *Islamophobia and Public Health in the United States*, AM. J. PUB. HEALTH (Nov. 2016), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5055770/...........................24, 26

Schmidt, Michael S. & Eric Lichtblau, *Racial Profiling Rife at Airport, U.S. Officers Say*, N.Y. TIMES (Aug. 12, 2012), https://www.nytimes.com/2012/08/12/us/racial-profiling-at-boston-airport-officials-say.html ...............................................................................19

Shane, Scott, *Homegrown Extremists Tied to Deadlier Toll Than Jihadists in U.S. Since 9/11*, N.Y. TIMES (June 24, 2015), https://www.nytimes.com/2015/06/25/us/tally-of-attacks-in-us-challenges-perceptions-of-top-terror-threat.html....................................................10

Sinnar, Shirin, *Separate and Unequal: The Law of "Domestic" and "International" Terrorism,* 117 Mich. L. Rev. 1333 (2019)................................10

Sisemore, Basima & Elsadig Elsheikh, *The Pervasiveness of Islamophobia in the United States*, Berkeley Othering and Belonging Institute (Sept. 13, 2022), https://belonging.berkeley.edu/pervasiveness-islamophobia-united-states ........................................................5, 23, 24

Smith, W. Paul, *Terrorism Fears Don't Justify Islamophobia*, Huffington Post (Mar. 14, 2017), https://www.hrw.org/news/2017/03/14/terrorism-fears-dont-justify-islamophobia..............................................................7

Swarns, Rachel, *Program's Value in Dispute as a Tool to Fight Terrorism*, N.Y. Times (Dec. 21, 2004), https://www.nytimes.com/2004/12/21/us/programs-value-in-dispute-as-a-tool-to-fight-terrorism.html ..............................................................8, 9

Temple-Raston, Dina, *Muslim Americans Question Scrutiny At Border*, NPR (Mar. 10, 2011), https://www.npr.org/2011/03/10/134402971/muslim-americans-question-scrutiny-at-border...............................................................16

*Traveler Inspections: DHS Mechanisms to Help Prevent Discrimination and Address Complaints*, U.S. Government Accountability Office (Dec. 2023), https://www.gao.gov/assets/d24105383.pdf ..............................15

*Trusted Traveler Revocations and the Muslim Ban*, Muslim Advocates (Jan. 29, 2018), https://muslimadvocates.org/files/2018.01.24_Trusted-Traveler-Fact-Sheet_FINAL.pdf ........................................................17

*Twenty Years Too Many: A Call to Stop the FBI's Secret Watchlist*, Council on American-Islamic Relations (June 12, 2023), https://www.cair.com/wp-content/uploads/2023/06/watchlistreport-1.pdf..........19

*U.S. Muslims Concerned About Their Place in Society, but Continue to Believe in the American Dream*, Pew Research Center (July 26, 2017), https://www.pewresearch.org/religion/2017/07/26/findings-from-pew-research-centers-2017-survey-of-us-muslims ...........................3, 4, 5, 22

*Voices United: Historic Protest in D.C. Calls for Ceasefire, Accountability, and Justice in Palestine*, American Muslims for Palestine (Jan. 20, 2024), https://www.ampalestine.org/media/media-room/statements/voices-united-historic-protest-dc-calls-ceasefire-accountability-and ..............................28

Volpp, Leti, *The Citizen and the Terrorist*, 49 UCLA L. Rᴇᴠ. 1575 (2002) 6, 10–11

*What is Islamophobia?*, Bʀɪᴅɢᴇ Iɴɪᴛɪᴀᴛɪᴠᴇ,
https://bridge.georgetown.edu/about-us/what-is-islamophobia/ (last visited
Feb. 2, 2024) ..........................................................................................................6

## INTERESTS OF *AMICI CURIAE*[1]

*Amici* are twelve civil rights and grassroots organizations that share a commitment to fighting discrimination and advancing social justice. They work to support and defend Muslims and people whom the government wrongly perceives to be Muslim based on identity characteristics, speech, and/or expressive conduct from the harms that they face from discriminatory, biased, and unwarranted governmental scrutiny and punitive retaliation. *Amici* therefore support Plaintiffs-Appellants in pursuing accountability from Defendants-Appellees for repeatedly and pervasively violating their religious rights.

---

[1] The accompanying appendix lists all *amici* filing this brief. No counsel for a party authored this brief in whole or in part, and no person other than *amici*, their members, or their counsel made a monetary contribution intended to fund the brief's preparation or submission. All parties have consented to the filing of this brief. *See* Fed. R. App. P. 29(a)(4)(E).

## SUMMARY OF ARGUMENT

Plaintiffs-Appellants ("Plaintiffs") are Muslim Americans whom Defendants-Appellees ("Defendants"), the heads of the U.S. Department of Homeland Security ("DHS") and its agencies, targeted for invasive and harmful questioning based on their religion when they returned to the U.S. from international travel. The district court properly found that Plaintiffs sufficiently alleged the existence of an official practice of governmental targeting of Muslim Americans for religious questioning at ports of entry. ER-32. However, the court contradicted itself by ultimately holding that Defendants had not questioned Plaintiffs "because of" their religion and wrongly credited Defendants' contention that the questioning was narrowly tailored to achieve a compelling governmental interest in maintaining border security. ER-60, 47.

Discriminatory questioning based on harmful and unfounded tropes that seek to correlate Islam with putative dangerousness and that otherwise reflects deep-seated Islamophobia and anti-Muslim bias is not narrowly tailored to the government's asserted interest in border security and calls that asserted interest into question. The institutional bias and animus at the heart of this case underlie a troubling pattern of governmental targeting of Muslims and people perceived to be Muslim for religious questioning and other intrusive and discriminatory conduct at

ports of entry. Communities affected by the conduct of DHS and its agencies have challenged these practices for decades.

Analyzing Plaintiff Hameem Shah's First Amendment retaliation claim, the district court found that Mr. Shah had not adequately alleged that Defendants' conduct would chill a "person of ordinary firmness" from engaging in protected activity. ER-57. However, the district court's finding sharply contrasts with the accounts of numerous people whom *amici* serve and of members of the Black, Arab, Middle Eastern, Muslim, and/or South Asian ("BAMEMSA") communities more broadly.

This case raises issues impacting the lives of many Muslim Americans and of people whom the government wrongly perceives to be Muslim based on identity characteristics and/or expression. According to a recent survey, over half of Muslim Americans have been treated unfairly by a law enforcement officer because of their religious identity.[2] Two-thirds of Muslim Americans have personally experienced Islamophobia and nearly two-thirds either have personally been affected by governmental policies that discriminate against Muslims and

---

[2] *U.S. Muslims Concerned About Their Place in Society, but Continue to Believe in the American Dream*, PEW RESEARCH CENTER (July 26, 2017), https://www.pewresearch.org/religion/2017/07/26/findings-from-pew-research-centers-2017-survey-of-us-muslims/.

people perceived to be Muslim or know someone who has.[3]  The stigma and

discrimination associated with the experience of Islamophobia harm the emotional

and mental well-being of the people it impacts.  Consequently, if left undisturbed,

the district court's ruling stands to harm many travelers who are Muslim or

perceived to be Muslim.

The district court erred in crediting Defendants' general invocation of

national-security interests over the credible and pervasive pattern of bias, animus,

and discrimination driving the harm that Plaintiffs suffered.  This Court should

reverse.  *See Hunley v. Instagram, LLC*, 73 F.4th 1060, 1068 (9th Cir. 2023) (*de

novo* appellate review applies to district court's grant of motion to dismiss); *Ariz.

Students' Ass'n v. Ariz. Bd. of Regents*, 824 F.3d 858, 864 (9th Cir. 2016) (courts

must accept as true well-pled factual allegations, drawing all favorable inferences

in plaintiffs' favor); *Starr v. Baca*, 652 F.3d 1202, 1216–17 (9th Cir. 2011)

(survival of motion to dismiss warranted by plausible factual allegations that need

not be probable, even where defendants' allegations also plausible).

---

[3] *Id.*

# ARGUMENT

## I. False and Harmful Anti-Muslim Stereotypes Are Entrenched in Defendants' Practices.

### A. Bias and animus against Muslims and people perceived to be Muslim lie at the heart of this case.

The Complaint describes Defendants' pattern and practice of targeting Muslim Americans for intrusive religious questioning. ER-31•32. Unfortunately, that pattern and practice extends well beyond Plaintiffs. More than half of Muslim Americans report mistreatment by a law enforcement officer *because they are Muslim*,[4] and nearly one-in-five Muslim Americans report having been singled out by airport security because they are Muslim.[5]

These realities flow from a larger historical context of U.S. governmental targeting of Muslims and people wrongly perceived to be Muslim that is based on dehumanizing and false tropes that are centuries old and cast Islam and its largely non-white, non-European adherents as inherently violent, alien, and inassimilable: the very antithesis of "civilization."[6] According to these biased and racialized

---

[4] Basima Sisemore & Elsadig Elsheikh, *The Pervasiveness of Islamophobia in the United States*, BERKELEY OTHERING AND BELONGING INSTITUTE (Sept. 13, 2022), https://belonging.berkeley.edu/pervasiveness-islamophobia-united-states (surveying 1,123 Muslim Americans in first-ever national survey to assess Islamophobia's prevalence from the perspectives of Muslims).

[5] *See U.S. Muslims Concerned About Their Place in Society, but Continue to Believe in the American Dream*, *supra* note 2.

[6] *See* Khaled A. Beydoun, *Islamophobia: Towards a Legal Framework*, 116 COLUMBIA L. REV. ONLINE 108, 111 (2016); *see also* THOMAS S. KIDD, AMERICAN

tropes, expressions or perceived indicia of Muslim identity correlate to putative dangerousness.[7]

These tropes can broadly be described as Islamophobic.  Islamophobia is "an extreme fear of and hostility toward Islam and Muslims which often leads to . . . social and political discrimination."[8]  Islamophobic law enforcement practices directly harm Muslims and people whom the government wrongly perceives to be Muslim when it uses race, ethnicity, skin color, national origin, or other perceived religious and/or cultural features such as a beard or head covering as proxies for Muslim identity.[9]

---

CHRISTIANS AND ISLAM: EVANGELICAL CULTURE AND MUSLIMS FROM THE COLONIAL PERIOD TO THE AGE OF TERRORISM (2009) (noting how, as early as the Colonial era of the United States, leading public figures in the U.S. like Aaron Burr promoted biased and dehumanizing views of Muslims in America); Thomas S. Kidd, *"Is It Worse to Follow Mahomet than the Devil?" Early American Uses of Islam*, 72 CHURCH HISTORY 766, 779• 80 (2003).

[7] Beydoun, *supra* note 6, at 111.  *See also* Leti Volpp, *The Citizen and the Terrorist*, 49 UCLA L. REV. 1575, 1576, 1584• 91 (2002) (contextualizing the racialization of Islamophobia and how/why the government wrongly uses race, ethnicity, national origin, skin color, appearance, and/or dress as proxies for Muslim identity); Craig Considine, *The Racialization of Islam in the United States: Islamophobia, Hate Crimes, and "Flying while Brown"*, 8 RELIGIONS 9, no. 165, 2017, at 6, 10• 11, https://www.mdpi.com/2077-1444/8/9/165 (same).

[8] *What is Islamophobia?*, BRIDGE INITIATIVE, https://bridge.georgetown.edu/about-us/what-is-islamophobia/ (last visited Feb. 2, 2024). While other terms have been used to describe prejudice against Muslims, "Islamophobia" has "proven to be both resonant and resilient."  Beydoun, *supra* note 6, at 109.

[9] Considine, *supra* note 7, at 6.

In the years following the events of September 11, 2001, Islamophobia grew more firmly embedded in public policies and practices, especially within law enforcement.[10]  In practice, that has amounted to a fixation within law enforcement on profiling Muslims and people perceived to be Muslim and surveilling their communities.[11]

Notwithstanding conclusory governmental assertions of national security interest, empirical evidence does not support law enforcement profiling of Muslims or people perceived to be Muslim.[12]  The lack of a link between Muslim identity

---

[10] *See* Elsadig Elsheikh, Basima Sisemore & Natalia Ramirez Lee, *Legalizing Othering: The United States of Islamophobia*, HAAS INSTITUTE FOR A FAIR AND INCLUSIVE SOCIETY at U.C. BERKELEY, AT 16• 17, 30• 33 (Sept. 2017), https://belonging.berkeley.edu/sites/default/files/haas_institute_legalizing_othering _the_united_states_of_islamophobia.pdf.

[11] *Id.* at 30• 33.

[12] Linda E. Fisher, *Guilt by Expressive Association: Political Profiling, Surveillance and the Privacy of Groups*, 46 ARIZ. L. REV. 621, 659 (2004) (discussing inefficacy of using religion, race, and/or ethnicity as proxies for risks associated with putative terrorism); Deborah A. Ramirez, et al., *Defining Racial Profiling in a Post-September 11 World*, 40 AM. CRIM. L. REV. 1195, 1210• 17 (2003) (analyzing data demonstrating the inefficacy of using race as part of a profile); W. Paul Smith, *Terrorism Fears Don't Justify Islamophobia*, HUFFINGTON POST (Mar. 14, 2017), https://www.hrw.org/news/2017/03/14/terrorism-fears-dont-justify-islamophobia; Adam Goldman and Matt Apuzzo, *NYPD: Muslim Spying Led to No Leads, Terror Cases*, ASSOC. PRESS (Aug. 21, 2012), https://www.ap.org/ap-in-the-news/2012/nypd-muslim-spying-led-to-no-leads-terror-cases (discussing the New York Police Department's (NYPD) acknowledgment that their Muslim surveillance program "never generated a lead").

and putative dangerousness should come as no surprise, given that racial profiling[13]

by law enforcement has repeatedly been shown ineffective at identifying

individuals who present a threat.[14] For example, the post-9/11 National Security

Entry-Exit Registration System "Call-In" program, which required non-citizens

from twenty-five predominately Muslim countries to report to immigration offices

to be interviewed by immigration officials, was terminated prematurely, and many

government officials agreed that it had not been an effective method of identifying

threats.[15] Similarly, the U.S. Department of Justice's ("DOJ") post-9/11 initiative

to interview thousands of non-citizens that they identified based on their gender,

---

[13] "'Racial Profiling' refers to the discriminatory practice by law enforcement officials of targeting individuals for suspicion of crime based on the individual's race, ethnicity, religion, or national origin." *Racial Profiling: Definition*, ACLU (Nov. 23, 2005), https://www.aclu.org/documents/racial-profiling-definition; *see also* Ramirez, et al., *supra* note 12 (defining "racial profiling" as "the inappropriate use of race, ethnicity, or national origin, rather than behavior or individualized suspicion, to focus on an individual for additional investigation").

[14] *See The End Racial Profiling Act of 2001: Hearing Before the Subcomm. on the Constitution, Federalism, and Property Rights,* 107th Cong. 59 (2000) (statement of David A. Harris, Balk Professor of Law and Values, University of Toledo College of Law) ("What is really striking about this data is that it is consistent across the board. There was only one factor in all of these data that predicted who would be stopped at higher rates, and that was either race or ethnic appearance. At the same time, the other shocking thing in this data, and this lies at the core of my book, is that as other witnesses have said, this is not a law enforcement practice that works. It is inefficient. It does not get the bad guys.").

[15] Rachel Swarns, *Program's Value in Dispute as a Tool to Fight Terrorism*, N.Y. TIMES (Dec. 21, 2004), https://www.nytimes.com/2004/12/21/us/programs-value-in-dispute-as-a-tool-to-fight-terrorism.html.

age, nationality, and date of entry failed to produce even a single terrorism conviction.[16]

Bound up in the governmental assumption that Muslim identity indicates a security threat is the baseless trope that the more religious a Muslim is, the more dangerous they are likely to be. Law enforcement practices that proceed from profiling to intrusively questioning Muslims or those perceived to be Muslim about their religious beliefs cannot, however, advance supposed national security interests. These practices fail their stated aims because they conflate strong religious beliefs with putative dangerousness.[17] In one brazen example of such flawed theories, a series of Federal Bureau of Investigation ("FBI") training materials leaked to the press in 2011 included, among other invidious assertions, a

---

[16] *Id.*

[17] *See* Amna Akbar, *Policing "Radicalization"*, 3 U.C. IRVINE L. REV. 809, 827 (2013) ("For example, the [2006 FBI] Intelligence Assessment identifies 'indicators the FBI has developed in order to identify an individual going through the radicalization process'—those indicators include '[w]earing traditional Muslim attire,' '[g]rowing facial hair,' '[f]requent attendance at a mosque or prayer group,' '[t]ravel to a Muslim country,' '[i]ncreased activity in a pro-Muslim social group or political cause,' and '[p]rosletyzing.'") (citation omitted); *see also id.* at 810 (quoting *House Intelligence Committee Hearing on FBI Counterterrorism and Intelligence Operations*, 112th Cong. (2011) (statement of Rep. Jan Schakowsky)) ("My concern is that [the FBI is] not looking at criminal behavior. We're not looking at violent behavior. But we're focusing on religious practices and that this is evident, and I could cite other evidence . . . of training materials and written materials of the FBI that describe people who, you know, wear Muslim clothing, et cetera, as being signals that they may be violent.").

chart baldly contending that the more "devout" a Muslim, the more likely that person is to be "violent."[18]  What the evidence shows, however, is that the bulk of political violence occurring within or otherwise facing the United States happens at the hands of white, non-Muslim Americans.[19]

Nevertheless, the engine of Islamophobic tropes continues to trigger the unwarranted and harmful application of more intense and intrusive law enforcement practices against Muslims and people whom the government wrongly presumes to be Muslim.[20]  Law enforcement practices based on animus,

---

[18] Spencer Ackerman, *FBI Teaches Agents: 'Mainstream' Muslims Are 'Violent, Radical'*, WIRED (Sept. 14, 2011), https://www.wired.com/2011/09/fbi-muslims-radical/.

[19] *See* Shirin Sinnar, *Separate and Unequal: The Law of "Domestic" and "International" Terrorism,* 117 MICH. L. REV. 1333, 1388 (2019) ("At least five recent comparative quantitative studies cast doubt on the assumption that Islamic extremist terrorism is more common or more deadly than terrorism based on other ideologies in the United States."); Ronald Bailey, *Do Muslims Commit Most U.S. Terrorist Attacks? Nope. Not even close.*, REASON (Mar. 24, 2017), https://reason.com/2017/03/24/do-muslims-commit-most-us-terrorist-atta/; Scott Shane, *Homegrown Extremists Tied to Deadlier Toll Than Jihadists in U.S. Since 9/11*, N.Y. TIMES (June 24, 2015), https://www.nytimes.com/2015/06/25/us/tally-of-attacks-in-us-challenges-perceptions-of-top-terror-threat.html; Sarah Ruiz-Grossman, *Most of America's Terrorists Are White, and Not Muslim*, HUFFINGTON POST (Aug. 23, 2017), http://www.huffingtonpost.com/entry/domestic-terrorism-white-supremacists-islamistextremists_us_594c46e4e4b0da2c731a84df; David Neiwert et al., *Homegrown Terror*, REVEAL (June 22, 2017), https://apps.revealnews.org/homegrown-terror/.

[20] Law enforcement targeting of Muslim Americans not only affects Muslims, but has cascading effects on other religious and ethnic groups thought to be associated with Islam.  The September 11 attacks contributed significantly to the racialization

stereotypes, or bias—none of which can stand in the place of data—cannot support the disparate and discriminatory treatment of individuals within the United States that is at issue in this case.

### B. Bias and animus against people who are Muslim and perceived to be Muslim are evident in this case.

Institutional bias and animus against Muslims and the broader BAMEMSA community are at the heart of Plaintiffs' experiences. The three Plaintiffs allege that they were targeted for questioning about their religious beliefs and practices because they are Muslim. For example, Plaintiff Imam Abdirahman Aden Kariye alleges that U.S. Customs and Border Protection ("CBP") officers questioned him at ports of entry about what mosque he attends, whether he had been on the Hajj[21] before, his involvement with a charitable organization affiliated with Muslim communities, and "[w]hat type of Muslim" he is. ER-85• 89. Plaintiff Mohamad Mouslli alleges that CBP officers questioned him about his religious beliefs, practices, and associations, including whether he is a Muslim and whether he is Sunni or Shi'a, and how many times a day he prays. ER-96• 98. Plaintiff Hameem

---

of a category of people who appear to be Middle Eastern, Arab, or Muslim. Volpp, *supra* note 7, at 1576, 1584; Considine, *supra* note 7, at 12• 13.

[21] The Hajj, the fifth pillar of Islam, is a sacred pilgrimage that all Muslims are to perform once in their lifetime if they are able to do so. *See* Hajj Information Sheet, ISLAMIC NETWORKS GROUP, https://ing.org/resources/for-all-groups/calendar-of-important-islamic-dates/hajj-information-sheet/ (last visited Feb. 2, 2024).

Shah alleges that CBP officers questioned him about how religious he and his family are, what mosque he attends, and whether he watches Islamic lectures online or on social media.  ER-103.

Plaintiffs allege that CBP targets Muslims for religious questioning because of their adherence to Islam, that this conduct is substantially motivated by an intent to discriminate against Muslims, and that the conduct stigmatizes Plaintiffs as Muslims and condemns their religion to suspicion and distrust.  ER-112, 117. Plaintiffs further allege that Defendants' written policies expressly permit border officers to question people about their religion: for example, the questionnaire that U.S. Immigration and Customs Enforcement ("ICE") officers use to guide interrogations at ports of entry includes intrusive questions about religious beliefs. ER-78.  While CBP's Standards of Conduct prohibit officers from "improperly" taking into account an individual's religion, they do not identify the circumstances in which an officer could "properly" consider religion.[22]

---

[22] Pls.' Opp'n. to Defs.' Mot. to Dismiss 5• 6, *Kariye v. Mayorkas*, No. 2:22-cv-01916, 2023 U.S. Dist. LEXIS 124717 (C.D. Cal. Feb. 10, 2023). *See also* Pls.' Statement of Facts for Pls.' Mot. for Summ. J. 4• 5, *Cherri v. Wray*, No. 2:12-cv-11656 (Dkt. 111-2) (E.D. Mich. May 28, 2019) (explaining, based on deposition testimony and documentary evidence, that no federal policy, custom, regulation, or practice forbids government agents from engaging in religious profiling or asking religious questions at ports of entry, and that immigration agents use a "religious questionnaire" for undisclosed types of investigations and secondary inspections).

CBP's institutional bias against Muslims and those perceived to be Muslim thus plays a central role in the harm that Plaintiffs experienced in this case, and the conduct at issue here is part of a broader pattern of animus and bias on the part of CBP and other U.S. government entities.

## C. The allegations in this case tie to a broader pattern of conduct by CBP and DHS reflecting bias and animus against Muslims and people perceived to be Muslim.

Through their work with clients and community members, *amici* are aware of recent examples mirroring the experiences of Plaintiffs and illuminating the CBP pattern and practice of discriminatory religious questioning of Muslims and people it wrongly perceives to be Muslim based on their identity-characteristics, speech, and/or expressive conduct.

*Amicus* the CLEAR Project has three such examples from within the past few months alone.[23]  In the first case, a 29-year-old Muslim Pakistani man returned to the U.S. in fall 2023 after undertaking a religious pilgrimage abroad.  CBP subjected him to secondary screening for approximately two hours, seizing and searching his phone, and asking him invasive questions about his religious identity and practices—including questions about religious texts in his suitcase, whether he is a Shi'a Muslim, and what he observed during his religious pilgrimage.  This

---

[23] Related correspondence with the CLEAR Project is on-file with counsel for *amici* and available to the Court.

encounter with CBP was incredibly anxiety-inducing, both for the individual and his family members in the U.S., who had been awaiting him at home with no word about his whereabouts while CBP detained him.

In the second example, a 23-year-old individual was returning to the U.S. in late 2023 after completing a religious pilgrimage in Iraq. CBP distressed him considerably by detaining him for over four hours, seizing and searching his phone, and asking him several invasive religious questions, including: "What are the differences between Sunni and Shi'a Muslims?", "What are the Islamic requirements for donations/charity?", "What mosque do you attend?", and "What does the Imam Ali Shrine look like?".

In the third case, a dual citizen of the U.S. and Palestine was traveling back to the U.S. in late 2023 after visiting Egypt. Detaining him for over eight hours, CBP agents questioned him about his views on Palestine and asked him religious questions, including "How often do you read the Qur'an?" and "How often do you pray?". When he informed them that he is not Muslim, one of the agents responded, "You're not Muslim? Now I'm even more confused." The individual understood that to mean that the agent had assumed that only Muslims could care about the plight of Palestinians. CBP seized his devices, after the attempts of multiple agents to get him to disclose his device-passcodes had failed. Overall, CBP's engagement of him left this individual concerned about his privacy and

fearful that he will continue to experience similar CBP harassment and targeting when traveling.

These extremely recent examples are just the tip of an iceberg of problematic CBP religious questioning of Muslim and other BAMEMSA people, which affected communities have been reporting and challenging for years.[24]

---

[24] *See, e.g.*, *Traveler Inspections: DHS Mechanisms to Help Prevent Discrimination and Address Complaints*, U.S. GOVERNMENT ACCOUNTABILITY OFFICE, at 36 (Dec. 2023), https://www.gao.gov/assets/d24105383.pdf (noting 479 complaints related to CBP "discrimination during the traveler inspection process" from fiscal years 2017• 21); Memorandum from Dana Salvano-Dunn, Office for Civil Rights and Civil Liberties, to Chris Magnus & Scott K. Falk, U.S. Customs and Border Protection, re: Tactical Terrorist Response Team, at 2 (Apr. 5, 2022), https://www.dhs.gov/sites/default/files/2022-07/2022.04.05%20CRCL%20Retention%20Memo%20to%20CBP%20-%20Tactical%20Terrorist%20Response%20Team%20-%20Redacted_508.pdf (detailing complaints of discriminatory CBP religious questioning of Muslims and people wrongly perceived to be Muslim, spanning 2019• 21); *CRCL Compliance Branch FY2020, Q1 and Q2*, DEP'T OF HOMELAND SEC., https://www.dhs.gov/sites/default/files/publications/compliance-one-pager-2020.pdf (noting DHS's 2020 review of "several allegations that CBP officers at ports of entry have inappropriately questioned travelers about their religious beliefs and practices"); Letter from Hugh Handeyside, American Civil Liberties Union Foundation, on behalf of Zainab Merchant, to John V. Kelly, U.S. Dep't of Homeland Sec., et al. re: Repeated Detention, Search, and Intrusive Questioning of U.S. Citizen at Multiple U.S. Airports and Ports of Entry (Aug. 14, 2018), https://www.aclu.org/cases/zainab-m?document=zainab-merchant-administrative-complaint-department-homeland-security#legal-documents (detailing recurrent discriminatory CBP religious questioning facing Muslim woman spanning 2016-18); Murtaza Hussain, *Complaints Describe Border Agents Interrogating Muslim Americans, Asking For Social Media Accounts*, THE INTERCEPT (Jan. 14, 2017), https://theintercept.com/2017/01/14/complaints-describes-border-agents-interrogating-muslim-americans-asking-for-social-media-accounts/ (describing 2017 reports of discriminatory CBP religious questioning of Muslims and people perceived to be Muslim); Dalia Mogahed & Youssef Chouhoud, *American Muslim*

However, CBP's targeting of Muslims and people it perceives to be Muslim is not

limited to religious questioning and has included an array of other discriminatory

conduct that impacted communities have also been reporting and challenging for

years.[25]  The webpage #FlyingWhileMuslim gathers firsthand accounts of CBP

---

*Poll 2017: Muslims at the Crossroads*, INSTITUTE FOR SOCIAL POLICY AND
UNDERSTANDING, at 13• 14 (2017), https://www.ispu.org/wp-
content/uploads/2017/03/American-Muslim-Poll-2017-Report.pdf (finding in
2017, Muslims were twice as likely as other travelers to face secondary screening
at the U.S. border when returning from international travel); Harrison Jacobs,
*American Muslim Reporter Describes 'Dehumanizing' Treatment At US Border*,
BUSINESS INSIDER (Sept. 24, 2013), https://www.businessinsider.com/sarah-
aburrahman-detained-at-us-border-2013-9?r=US&IR=T (describing 2013 reports
of discriminatory CBP religious questioning faced by Muslims and people
perceived to be Muslim); Todd Miller, *Citizens in Name Only: Muslim-Americans
on the U.S.-Canada Border*, NORTH AMERICAN CONGRESS ON LATIN AMERICA
(Sept. 12, 2012), https://nacla.org/blog/2012/9/12/citizens-name-only-muslim-
americans-us-canada-border (2012 reports of same); Dina Temple-Raston, *Muslim
Americans Question Scrutiny At Border*, NPR (Mar. 10, 2011),
https://www.npr.org/2011/03/10/134402971/muslim-americans-question-scrutiny-
at-border (2011 article about same); Memorandum from Margo Schlanger, Office
for Civil Rights and Civil Liberties, and Audrey J. Anderson, Office of the General
Counsel, to Alan Bersin & Alfonso Robles, U.S. Customs and Border Protection,
re: Complaint No. 10-10-CBP-0137 (*inter alia*) (May 3, 2011),
https://www.aclu.org/files/borderquestioning/ACLU_BQ_000016.pdf (detailing
reports of same spanning 2004-11); Border Questioning – Produced Documents,
ACLU (Mar. 12, 2012), https://www.aclu.org/documents/border-questioning-
produced-documents (documents produced under the Freedom of Information Act
concerning discriminatory CBP religious questioning of Muslims and people
perceived to be Muslim, including numerous firsthand accounts ("Letter[s] of
Complaint") from impacted people whose experiences span roughly 2007• 11).

[25] *See, e.g.*, Patrick Grubb, *Source provides directive telling CBP officers to detain
Iranian-born travelers*, THE NORTHERN LIGHT (Jan. 29, 2020),
https://www.thenorthernlight.com/stories/source-provides-directive-telling-cbp-
officers-to-detain-iranian-born-travelers,9315 (describing 2020 CBP directive
instructing Seattle agents to conduct vetting of individuals with links to Palestine,

Iran, and/or Lebanon); Joel Rose, *CBP Chief Admits Officers 'Overzealous'; Critics Say Iranians And Others Targeted*, NPR (Feb. 13, 2020), https://www.npr.org/2020/02/13/805409436/cbp-chief-admits-officers-overzealous-critics-say-iranians-and-others-targeted (reflecting admission of head of CBP that Seattle agents had gotten "a little overzealous" in their targeting of Iranian-Americans and describing broader targeting of travelers from Iran and the Middle East); Memorandum from Cameron P. Quinn, Office for Civil Rights and Civil Liberties, to Mark A. Morgan & Scott K. Falk, U.S. Customs and Border Protection, re: Invalidating F1 Visas of Iranian Nationals (June 15, 2020), https://www.dhs.gov/sites/default/files/publications/retention-memo-cbp-invalidating-f1-visas-iranian-nationals-06-15-20.pdf (2020 announcement of civil rights investigation into, and summary of details of, widespread reports of CBP's discriminatory targeting of Iranian students at various ports of entry); *Trusted Traveler Revocations and the Muslim Ban*, MUSLIM ADVOCATES (Jan. 29, 2018), https://muslimadvocates.org/files/2018.01.24_Trusted-Traveler-Fact-Sheet_FINAL.pdf (detailing how, as of January 2017, CBP began to revoke memberships in its Trusted Traveler programs (*e.g.*, Global Entry) for people from any of the seven Muslim-majority countries listed in Exec. Order 13769 (popularly referred to as "the Muslim Ban") and for other people whom CBP presumed to be Muslim based on their name or background); Letter from The Sikh Coalition, et al. to Sec. Alejandro Mayorkas, Department of Homeland Security, re: Ending border officials' religious-freedom violations and their practice of trashing migrants' personal belongings (Aug. 22, 2022), https://www.aclu.org/documents/letter-dhs-secretary-mayorkas-ending-border-officials-religious-freedom-violations (letter of over 160 advocacy organizations concerning CBP's persistent religious discrimination against Sikhs via pervasive confiscation of their turbans and other religious articles of faith and otherwise reporting widespread denials by CBP of religious diets to Sikhs, Muslims, and other faith groups); Memorandum from Dana Salvano-Dunn, Office for Civil Rights and Civil Liberties, to Chris Magnus & Scott K. Falk, U.S. Customs and Border Protection, re: Allegations Relating to Treatment of Religious Items During CBP Processing and Access to Religious Meals (Nov. 10, 2022), https://www.dhs.gov/sites/default/files/2023-05/retention-memo-cbp-religious-items-meals-11-10-22.pdf (announcing civil-rights investigation of same).

profiling and related indignities that Muslim individuals experience during travel, illustrating the harmful impact that this conduct has on them.[26]  Likewise, the results of a 2019•20 survey conducted by *amicus* Muslims for Just Futures reflect an overall pattern of discriminatory targeting and gender-based violence by CBP against Muslims, with 25% of the Muslims surveyed reporting that CBP targets them for secondary screening every time it inspects them.[27]

The pattern of discriminatory behavior exhibited by CBP in this case fits into a broader pattern of institutional bias from DHS against Muslims and other BAMEMSA people whom it wrongly perceives to be Muslim based on identity characteristics and/or expression.  DHS permits intelligence activities on the basis of a "reasonable belief" that considering a trait, including religion, in conjunction with "other information," serves a legally authorized purpose—"effectively sanction[ing] discriminatory profiling."[28]  Moreover, DHS uses "opaque and unverifiable" risk assessment tools to identify travelers who may be security

---

[26] *See #FlyingWhileMuslim: Stories from our Community*, MPOWER CHANGE, https://www.mpowerchange.org/flyingwhilemuslimstories (last visited Feb. 2, 2024).

[27] Related correspondence with Muslims for Just Futures is on-file with counsel for *amici* and available to the Court.

[28] Harsha Panduranga & Faiza Patel, *Stronger Rules Against Bias: A Proposal for a New DHS Nondiscrimination Policy*, BRENNAN CENTER FOR JUSTICE, at 2 (Sept. 15, 2022), https://www.brennancenter.org/our-work/policy-solutions/stronger-rules-against-bias.

threats or violate customs laws, and its guidance omits religion from the traits that can be the basis of biased decision-making.[29]

The federal government's use of a "terrorist watchlist" provides a further example of the pattern of discrimination against Muslims and people whom it wrongly perceives to be Muslim. The government's practice of maintaining a consolidated watchlist dates to 2003, and by the end of 2023 the list included the names of approximately two million people.[30] The 2019 version of the watchlist was leaked in 2023, showing that the government disproportionately targeted Muslims for inclusion on the list: the Council on American-Islamic Relations estimated that "98 percent of the names are in reference to Muslims."[31] Plaintiffs Kariye and Mouslli allege that they were on this watchlist for several years prior to

---

[29] *Id.* at 3• 4. *See also* Michael S. Schmidt & Eric Lichtblau, *Racial Profiling Rife at Airport, U.S. Officers Say*, N.Y. TIMES (Aug. 12, 2012), https://www.nytimes.com/2012/08/12/us/racial-profiling-at-boston-airport-officials-say.html (highlighting concerns that a "behavior detection" program employed by the Transportation Security Administration, a DHS agency, to spot potential terrorists at Logan International Airport became a "magnet for racial profiling").

[30] *Twenty Years Too Many: A Call to Stop the FBI's Secret Watchlist*, COUNCIL ON AMERICAN-ISLAMIC RELATIONS (June 12, 2023), https://www.cair.com/wp-content/uploads/2023/06/watchlistreport-1.pdf; *see also* E.D. Cauchi & Imtiaz Tyab, *U.S. terrorist watchlist grows to 2 million people — nearly doubling in 6 years*, CBS NEWS (Dec. 14, 2023), https://www.cbsnews.com/news/us-terrorist-watchlist-grows/.

[31] Representative Katie Porter, Letter to the President of the United States (June 27, 2023), https://www.cair.com/wp-content/uploads/2023/06/RepPorterLetter.pdf.

the incidents at issue in this case and that they do not know why they were placed on the watchlist.  ER-47.

Being placed on the watchlist can subject a person to "severe" consequences, including denial of employment credentials and invasive searches and questioning at the U.S. border.[32]  Watchlisted individuals have further reported "facing increased police harassment."[33]

The district court here used Plaintiffs' allegations regarding their inclusion on the watchlist to find *against* Plaintiffs on their First Amendment Free Exercise Clause claim, reasoning that the questioning of individuals on the watchlist is narrowly tailored to achieve the governmental interest in protecting the U.S. against political violence.  ER-47• 49.  Yet, as a group of U.S. Senators and Representatives highlighted in December 2023, "[t]he accuracy of the list has long been called into question."[34]  The loose standard to place an individual on the watchlist "results in wide discretion for officers with few meaningful constraints," and analysts have incentives to add names liberally; as of 2014, the government had not identified *any* known terrorist group affiliated with nearly half of the

---

[32] Panduranga & Patel, *supra* note 28, at 2.

[33] Letter from Sen. Elizabeth Warren, et al. to Hon. Merrick Garland, et al., at 9 (Dec. 20, 2023), https://www.warren.senate.gov/imo/media/doc/2023.12.20%20Terrorism%20Watchlist%20Letter.pdf.

[34] *Id.* at 3.

people on the watchlist.[35]  In short, the watchlist is not a reliable tool to screen travelers for potential security threats, and the disproportionate risk that Muslims and people whom the government wrongly perceives to be Muslim face of being wrongfully placed on the watchlist have led some to refer to it as a "Muslim registry."[36]  The watchlist and all other umbrella DHS practices reflecting Islamophobia underscore and calcify the pervasive and discriminatory religious questioning that has harmed the Plaintiffs and so many BAMEMSA community members like them.

## II.    The Resolution of This Case May Have Far-Reaching Impacts on the Lived Experiences of Muslim Americans and People Perceived to Be Muslim.

Were this Court to affirm the district court's ruling, far-reaching, profound harms caused by pervasive governmental bias could continue unchecked against a wide spectrum of individuals who are Muslim or whom the government wrongly perceives to be Muslim.  It is estimated that in 2017, there were 3.45 million Muslims living in the U.S.; this figure constitutes 1.1% of the U.S. population.[37]  Moreover, the racialized nature of Islamophobic tropes embedded in law

---

[35] *Id.* at 5.

[36] *Id.* at 7.

[37] Besheer Mohamed, *New estimates show U.S. Muslim population continues to grow.* PEW RESEARCH CENTER (Jan. 3, 2018), https://www.pewresearch.org/short-reads/2018/01/03/new-estimates-show-u-s-muslim-population-continues-to-grow/.

enforcement practices means that the government often wrongly presumes people to be Muslim based on their identity characteristics, such as race and ethnicity, or based on their speech and expression. All of these people stand to face the harm that affirming the district court's ruling here could cause.

### A. Practicing Muslims face significant discrimination due to their faith, leading to emotional, mental, and social challenges.

Muslims throughout America practice their faith in a myriad of ways, many of which are visibly identifiable and make them highly vulnerable to discrimination. These practices include attendance of religious services and daily prayer. Roughly four-in-ten Muslims say they attend religious services at least weekly, with a similar proportion saying they perform *salah*, Islam's five daily prayers.[38] A majority of Muslim Americans state that religion is "very important" to them.[39]

Studies of the Muslim experience in the U.S. demonstrate the vulnerability of Muslims to discrimination and Islamophobia. For example, a 2022 study performed at U.C. Berkeley and submitted to the United Nations Committee on the Elimination of Racial Discrimination found that over half of the Muslims surveyed reported being treated unfairly by a law enforcement officer because of their

---

[38] *U.S. Muslims Concerned About Their Place in Society, but Continue to Believe in the American Dream*, *supra* note 2.

[39] *Id.*

religious identity.[40]  Additionally, two-thirds of participants had personally experienced Islamophobia,[41]  and almost two-thirds of survey participants reported that they themselves, family members, friends, or community members had been affected by governmental policies that disproportionately discriminated against Muslims.[42]

The experience of Islamophobia is pervasive in America.  Data shows that 82% of American adults consider Muslims to be subject to at least some discrimination in the U.S.[43]  The majority of those Americans consider Muslims to face a lot of discrimination.[44]  Many Muslims confirm that perspective, citing specific personal instances of discrimination, such as being treated with suspicion, being singled out by airport security, or being called offensive names.[45]  Troublingly, over 60% of Americans said that being Muslim hurts one's chances for advancement in American society, at least a little.[46]

---

[40] Sisemore & Elsheikh, *supra* note 4.

[41] *Id.*

[42] *Id.*

[43] David Masci, *Many Americans see religious discrimination in U.S. – especially against Muslims*, PEW RESEARCH CENTER (May 17, 2019), https://www.pewresearch.org/short-reads/2019/05/17/many-americans-see-religious-discrimination-in-u-s-especially-against-muslims/.

[44] *Id.*

[45] *Id.*

[46] *Id.*

Islamophobia not only interferes with the exercise of legal rights and religious liberty but also harms social, emotional, and mental well-being.  In assessing psychological and emotional effects of Islamophobia, one study found that almost all responders said that Islamophobia harms their emotional and mental well-being.[47]  Experiences of Islamophobia have repercussions: most of the study participants reported censoring their speech or actions based on fear of how others may respond or react to them.[48]  Another study found that the stigma and discrimination associated with Islamophobia can lead to adverse health effects, such as stress, depression, poor sleep, high blood pressure, cognitive impairment, and even mortality.[49]  Discrimination can also affect access to health and social resources and increase exposure to risk factors for poor health, physiological harms, experiencing violence, and experiencing stress.[50]

---

[47] Sisemore & Elsheikh, *supra* note 4.

[48] *Id.*

[49] Goleen Samari, *Islamophobia and Public Health in the United States*, AM. J. PUB. HEALTH (Nov. 2016), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5055770/.

[50] *Id. See also, e.g.*, Letter of Complaint (ACLU_BQ_000048), Office for Civil Rights and Civil Liberties, U.S. Department of Homeland Security (Mar. 23, 2011), https://www.aclu.org/files/borderquestioning/ACLU_BQ_000048.pdf ("Since [crossing the border for the first time], I have had losses of relationship, business, and a lot of emotional pain because of my inability to attend to my family and friends' events in Canada."); Letter of Complaint (ACLU_BQ_000040), Office for Civil Rights and Civil Liberties, U.S. Department of Homeland Security, https://www.aclu.org/files/borderquestioning/ACLU_BQ_000040.pdf ("I did not recover from it yet. I feel violated, enraged, humiliated, feeling low, ashamed,

Given the widespread harms of Defendants' Islamophobia, the Court's ruling in this case has the ability to promote both governmental accountability and the dignity, humanity, and well-being that free religious exercise supports.

### B. Individuals perceived to be Muslim also face discrimination and its associated harms.

The government often misperceives many non-Muslims to be Muslim based on identity characteristics like race and ethnicity. For example, non-Muslim Black, Arab, Middle Eastern, and/or South Asian communities face Islamophobia and related forms of discrimination and bias from law enforcement. The Black population constitutes almost 15% of the U.S. population, with 47.9 million people self-identifying as Black.[51] Black Muslims make up at least 20% of the total Muslim population in the U.S.[52] There are nearly 3.7 million Arab Americans.[53] The Middle Eastern and North African ("MENA") population stands around 3.8

---

depressed, helpless, and always with tears in my eyes. Whenever anyone tries to mention it I feel that rage, and my heart start pumping and all I want is to cry.").

[51] Mohamed Moslimani, et al., *Facts About the U.S. Black Population*. PEW RESEARCH CENTER (Jan. 18, 2024), https://www.pewresearch.org/social-trends/fact-sheet/facts-about-the-us-black-population/.

[52] Besheer Mohamed & Jeff Diamant, *Black Muslims Account for a Fifth of All U.S. Muslims and About Half Are Converts to Islam*, PEW RESEARCH CENTER (Jan. 17, 2019), https://www.pewresearch.org/short-reads/2019/01/17/black-muslims-account-for-a-fifth-of-all-u-s-muslims-and-about-half-are-converts-to-islam/.

[53] *National Arab American Demographics*, ARAB AMERICAN INSTITUTE, https://www.aaiusa.org/demographics (last visited Feb. 2, 2024).

million in the U.S. as of 2021,[54] and based on the 2020 census, nearly half of the MENA population identifies as Lebanese, Iranian, or Egyptian.[55]  In addition, there are almost 5.4 million South Asians living in the U.S.[56]  Due to the racialization of Islamophobia, non-Muslims in these communities face Islamophobia.  For instance, a study of the Arab-American community in Detroit found post-9/11 abuse and discrimination associated with less happiness, increased psychological distress, and poorer perceptions of health status for both Muslims and Christians.[57]  Another qualitative study exploring the experiences of non-Muslim men who have experienced Islamophobia because others perceived them to be Muslim recounted the emotional, psychological, behavioral, physical, and financial impact of

---

[54] Andrew C. Forrester, *Middle Eastern or North African in U.S. Government Surveys: A Preview of MENA Demographics*, CATO INSTITUTE (Sept. 27, 2023), https://www.cato.org/briefing-paper/middle-eastern-or-north-african-us-government-surveys-preview-mena-demographics.

[55] Rachel Marks, Paul Jacobs & Alli Coritz, *Lebanese, Iranian and Egyptian Populations Represented Nearly Half of the MENA Population in 2020 Census*, UNITED STATES CENSUS BUREAU (Sept. 21, 2023), https://www.census.gov/library/stories/2023/09/2020-census-dhc-a-mena-population.html.

[56] *Demographic Information*, SOUTH ASIAN AMERICANS LEADING TOGETHER, https://saalt.org/south-asians-in-the-us/demographic-information/ (last visited Feb. 2, 2024).

[57] Samari, *supra* note 49.

experiencing anti-Muslim hate crime.[58]  As evidenced, this population, too, suffers the lasting harms of Islamophobia.

Speech and expressive conduct, such as social media posts or protest attendance, can create further grounds for governmental scrutiny based on actual or perceived Muslim identity.  Federal agencies, including DHS, the FBI, and the Department of State, extensively monitor social media sites.[59]  This monitoring can hurt Muslim and broader BAMEMSA communities because it can falsely label people as putative threats, repress their ability to speak openly online, and invade their privacy.[60]  Black, Latino, and Muslim people have been especially vulnerable to being labeled as putative threats based on social media and have often been targets of social media screening as part of travel and immigration screening

---

[58] Imran Awan & Irene Zempi, *Non-Muslim men who suffer Islamophobia: A Briefing Paper* (Preparation for the report to the 46th Session of Human Rights Council, 2020), at 9• 10, https://www.ohchr.org/sites/default/files/Documents/Issues/Religion/Islamophobia -AntiMuslim/Civil%20Society%20or%20Individuals/ProfAwan-4.pdf ("My identity is always questioned because I look like a Muslim.  It does make me feel low but I got used to it.  As a Black man with a beard you always get associated as being a Muslim terrorist.") ("We are now resigned to the fact that we have to endure anti-Muslim harassment on a daily basis.") ("We live in fear every day.  We face abuse and intimidation daily but we should not have to endure this abuse.").

[59] Rachel Levinson-Waldman, Harsha Panduranga, and Faiza Patel, *Social Media Surveillance by the U.S. Government*, BRENNAN CENTER FOR JUSTICE (Jan. 7, 2022), https://www.brennancenter.org/our-work/research-reports/social-media-surveillance-us-government.

[60] *Id.*

procedures.[61]  Social media platforms are not the only place one may experience bias based on expression.  In the current climate, protests supporting Palestinian human rights involve many people from the Muslim and broader BAMEMSA communities,[62] and these individuals stand to face severe backlash for their supportive actions, including by government officials.  Advocacy organizations have noted hundreds of incidents across the U.S. that have incited anti-Palestinian, anti-Arab, and anti-Muslim harassment.[63]  When combined, this scrutiny and discrimination illustrate the broad sweep of Muslim and other BAMEMSA individuals harmed by speaking out in support of Palestinian human rights within the current climate.

As such, the biases and discrimination underlying the type of law enforcement conduct at issue in this case pose the threat of psychological, emotional, mental, and social harm to many, whether they practice Islam or are

---

[61] *Id.*

[62] *Voices United: Historic Protest in D.C. Calls for Ceasefire, Accountability, and Justice in Palestine*, AMERICAN MUSLIMS FOR PALESTINE (Jan. 20, 2024), https://www.ampalestine.org/media/media-room/statements/voices-united-historic-protest-dc-calls-ceasefire-accountability-and (noting over 400,000 protestors from over 35 states and 125 cities joined the American Muslim Task Force for Palestine in demanding ceasefire and accountability in relation to the humanitarian crisis facing Palestinians).

[63] *Hundreds of Legal Community Members Demand Action To Stop Racist Targeting of Palestine Advocates and Safeguard Fundamental Rights*, PALESTINE LEGAL (Oct. 19, 2023), https://palestinelegal.org/legal-community-letter.

misperceived by the government to be Muslim based on identity, speech, or expressive conduct. In its resolution of this appeal, this Court has a choice: allow Plaintiffs, who are concretely harmed by governmental Islamophobia, to make their case on the merits, or instead disregard the discriminatory practices harming them and countless BAMEMSA people like them.

## CONCLUSION

For the foregoing reasons, *amici* respectfully support Plaintiffs in urging this Court to reverse the district court's order granting dismissal of Plaintiffs' First Amended Complaint and remand the case for their claims to proceed on their merits.

Dated: February 2, 2024

Respectfully submitted,

By: /s/ Laura Lin
    LAURA LIN
    laura.lin@stblaw.com
    SIMPSON THACHER & BARTLETT LLP
    2475 Hanover Street
    Palo Alto, California 94304
    Telephone: (650) 251-5160
    Facsimile: (650) 251-5002

    GOLNAZ FAKHIMI
    golnaz@muslimadvocates.org
    REEM SUBEI
    reem@muslimadvocates.org
    MUSLIM ADVOCATES

1032. 15th Street N.W. #362
Washington, D.C. 20005
Telephone:     (202) 655-2969

*Counsel for Amici Curiae*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** 23-55790

I am the attorney or self-represented party.

**This brief contains 6,587 words,** including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[X] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties.
    [ ] a party or parties are filing a single brief in response to multiple briefs.
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/ Laura Lin_____ **Date** February 2, 2024
*(use "s/[typed name]" to sign electronically-filed documents)*

## CERTIFICATE OF SERVICE

I hereby certify that on February 2, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I hereby certify that on February 2, 2024, the foregoing document was served on all parties or their counsel of record through the CM/ECF system.

/s/ Laura Lin
Laura Lin

Counsel for *Amici Curiae*

# APPENDIX LISTING *AMICI CURIAE*

African Communities Together

American-Arab Anti-Discrimination Committee (ADC)

Arab Resource and Organizing Center (AROC)

Asian Americans Advancing Justice – Asian Law Caucus

Asian American Legal Defense and Education Fund

CLEAR Project

Muslim Advocates

Muslims for Just Futures

National Immigration Law Center

National Immigration Project

Partnership for the Advancement of New Americans

Sikh Coalition